UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
KEVIN BUSSEY,                     :
                                  :    04 Civ. 6679 (VM)
                    Plaintiff     :
                                  :    **DECISION AND ORDER**
     -against-                    :
                                  :
WILLIAM PHILLIPS, Superintendent; :
DELORES THORNTON, Deputy          :
Superintendent; DAVID THACKER,    :
Deputy Superintendent; and        :
JAMES TEMPLE, Senior Counselor,   :
Program Committee,                :
                                  :
                    Defendants.   :
----------------------------------X

**VICTOR MARRERO, United States District Judge.**

Pro se Plaintiff Kevin Bussey ("Bussey") brought this action pursuant to 42 U.S.C. § 1983, seeking to redress alleged violations of his constitutional rights under the First, Fifth, Sixth, Ninth and Fourteenth Amendments of the United States Constitution.[1]   Bussey also sought to redress an alleged conspiracy to violate those rights and intentional and negligent infliction of physical and emotional injury.   The defendants, all employees of the New York State Green Haven Correctional Facility ("Green Haven") where Bussey is incarcerated, are William Phillips, Superintendent; Delores Thornton, Deputy Superintendent; David Thacker, Deputy Superintendent; and James

---

[1] Although Bussey does not cite the Eighth Amendment, the Court reads his Complaint as alleging claims under the Eighth Amendment as well.

1

Temple, Senior Counselor, Program Committee (collectively, "Defendants").

On November 30, 2004, Defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss Bussey's Complaint. On March 31, 2005, the Court, given the extensive documentation Bussey attached to his complaint outside of the pleadings, converted the motion to dismiss into one for summary judgment under Federal Rule of Civil Procedure 56(c) and allowed the parties additional time to submit supplementary materials for the Court's consideration. Bussey and Defendants each submitted papers in support of or in opposition to the motion for summary judgment. In those papers Bussey also requested additional discovery, after the completion of which he sought to amend his complaint. (<u>See</u> Affirm. in Supp. of Reply Answer to Defs.['] Mot. for Summ. J. and Pl.'s Counter Mot. to Conduct Discovery Pursuant to Fed. Rule of Civ. Proc. Rules 30, 33, 34, and Amendment of the Compl. Pursuant to Rule 15(a), dated July 20, 2005 ("Bussey Summ. J. Aff.").) By Order dated September 30, 2005, the Court granted Defendants' motion for summary judgment and denied Bussey's requests for discovery and leave to amend his complaint. The Court there indicated that its findings, reasoning and conclusions would be set forth in a subsequent Decision and Order.

Before the Court issued any subsequent Decision and Order, Bussey filed a notice of appeal to the Second Circuit, which ousted this Court of jurisdiction. See <u>Toliver v. County of Sullivan</u>, 957 F.2d 47, 49 (2d Cir. 1992); <u>Ryan v. United States Line Co.</u>, 303 F.2d 430, 434 (2d Cir. 1962). This Court, by order dated January 26, 2006, then sought a limited remand of the case so that it could issue its full Decision and Order articulating its findings, reasoning and conclusions. This Court also sought the limited remand because, in setting forth in further detail the basis for the September 30, 2005 order, the Court found that both the facts and the law required it to reconsider its earlier findings as to Bussey's equal protection claim. By letter dated January 27, 2006, Defendants indicated that they did not oppose the remand of the case or the Court's reconsideration of the claim, but requested that, should the Court ultimately vacate its previous dismissal of the claim, the Court schedule discovery, after which the Defendants be allowed to again move for summary judgment.

On February 24, 2006, the Second Circuit remanded the case and returned jurisdiction to this court.

Accordingly, this Opinion further explains the basis for the Court's September 30, 2005 ruling. Additionally, the Court has reconsidered its dismissal of Bussey's equal protection claim. Specifically, the Court finds as regards this cause of

action that Bussey has stated a claim sufficient to survive a motion to dismiss.  Given that Bussey has stated an equal protection claim and made at least two subsequent requests for discovery, summary judgment on Bussey's equal protection claim is not appropriate at this time.  As will be explained in detail below, the Court therefore denies Defendants' summary judgment motion, without prejudice, only as to the equal protection claim and will grant Bussey limited discovery on this claim.

## I. BACKGROUND[2]

---

[2] The factual recitation set forth below derives from Bussey's Complaint, the exhibits attached to the Complaint, Bussey's two affidavits submitted in opposition to Defendants' motion for summary judgment (specifically, Bussey's Aff. in Opp'n, dated May 5, 2005; and Bussey's Summ. J. Aff., dated July 20, 2005); and Defendants' affidavits and exhibits submitted in support of their motion for summary judgment.  Defendants' affidavits include the following, which are all attached to the Declaration of Jennifer L. Johnson, dated June 3, 2005:  (1) Declaration of James Temple, dated May 18, 2005 ("Temple Decl."); (2) Declaration of William Totten, dated May 20, 2005 ("Totten Decl."); (3) Declaration of William E. Phillips, dated May 27, 2005 ("Phillips Decl."); (4) Declaration of Delores Thornton, dated May 23, 2005 ("Thornton Decl.).  The exhibits include the following:  (1) Bussey's Inmate Program Assignment Printout, attached as Ex. 5 to Temple Decl.; (2) Bussey's Inmate Disciplinary History Printout, attached as Ex. A to Johnson Decl.; (3) Inter-Departmental Communication by Panten, attached as Ex. 1 to Temple Decl.; (4) Inmate Misbehavior Report, dated Sept. 20, 2002, attached as Ex. 1 to Compl.; (5) Superintendent Review Form, dated Dec. 4, 2002, attached as p. 10 of Ex. 6 of Totten Decl.; (6) Superintendent Hearing Disposition, dated Oct. 8, 2002 ("Hearing Disposition"), attached as p. 5 of Ex. 6 attached to Totten Decl.; (7) Email from Haubert to Temple, dated October 15, 2002, attached as Ex. 2 to Temple Decl.; (8) Inter-Departmental Communication from Temple to Bussey, dated October 16, 2002, attached as Ex. 3 to Temple Decl.; (9) Inmate Grievance Complaint, dated November 4, 2002, attached as pp. 1-3 of Ex. 6 to Totten Decl. and as Ex. F to Compl.; (10) Policy and Procedure Statement No. 312 ("P&P 312"), attached as Ex. 4 to Temple Decl.; (11) Form 2133, attached as p. 7 of Ex. 6 to Totten Decl.; (12) Inmate Grievance Case History & Record dated 12/10/02 and Inmate Grievance Program Investigation form, attached as pp. 8-9 of Ex. 6 to Totten Decl.; (13) I.G.R.C. Response form, dated November 19, 2002 ("I.G.R.C. Response"), attached as p. 6 of Ex. 6 to Totten Decl.; (14) Appeal to C.O.R.C., dated Dec. 9, 2002 ("C.O.R.C. Appeal"), attached as pp. 11-13 of Ex. 6. to Totten Decl.; (15) Central Office Review Committee Grievance determination, dated Jan. 8, 2003 ("C.O.R.C. Determination"), attached as p. 18 of Ex. 6. to Totten Decl.; (16) Letter from Kevin Bussey to Superintendent of Industry, dated Mar. 18, 2003, attached as Ex. B to Johnson Decl.; (17) Letter from William E. Phillips to

Since approximately 1997, Bussey has been incarcerated at Green Haven.  From July 12, 1999 through November 3, 2002, Bussey was assigned intermittently to work in Green Haven's Industry Program, Corcraft Industries ("Industry Program") in the Chair Shop.  During this period, Bussey also spent time in other programs or was idle.  According to Bussey's disciplinary history, on January 26, 2000 Bussey was charged with violent conduct, threats, harassment and refusal to follow a direct order.  As a result, from February 13, 2000 until March 5, 2000, Bussey was removed from the Chair Shop for disciplinary reasons.  Bussey returned to the Chair Shop on June 5, 2000 after completing time at the Upholstery Shop.  Bussey also spent two months in the Aggression Replacement Workshop from October 1, 2001 to December 2, 2001.  Bussey was permanently removed from the Chair Shop in November 2002.

A.   THE SEPTEMBER 20, 2002 ASSAULT AND BUSSEY'S PERMANENT REMOVAL FROM THE CHAIR SHOP

On September 20, 2002, Bussey, along with two other inmates, allegedly engaged in a violent assault against another inmate while in the Chair Shop.  Correction Officer H. Panten ("Panten"), who was present at the time of the assault, reported that at approximately 9:30 a.m., Bussey punched another inmate

---

Kevin Bussey, dated Mar. 28, 2003 ("Phillips Ltr."), attached as Ex. 7 to Phillips Decl.  Except as quoted or otherwise specifically cited below, no further references to these documents will be made.

from behind, causing the inmate to fall to the floor.   Two additional inmates joined Bussey in kicking the fallen inmate. Panten ordered the inmates to stop fighting, all stopped and separated, a response team arrived and no further fighting took place.

Thereafter, Bussey was issued a misbehavior report for his participation in the assault.   However, the misbehavior report was dismissed on a technicality.   The computer printout of the hearing disposition has a handwritten note on it stating "dismissed procedural error."   (See Hearing Disposition.) According to Defendants' counsel, the hearing officer had no memory of the situation and the reasons for the dismissal were not documented.

However, on October 15, 2002, Captain Haubert, a security supervisor from the Chair Shop, notified James Temple ("Temple"), Senior Counselor on the Program Committee, that although the misbehavior reports issued to Bussey and the other two inmates involved in the attack had been dismissed due to procedural error, for security reasons Bussey and the other two inmates could not return to the Chair Shop.   The next day, Temple notified Bussey by memorandum that Bussey had been "temporarily suspended from [his] assignment in the Chairshop, due to Security" and that he should not return to his assignment until he had been seen by the Program Committee.   The memorandum

6

stated that Bussey would be scheduled to appear before the Program Committee in the near future.

According to Defendants, Bussey appeared before the Program Committee on or about November 3, 2002. Although Bussey does not indicate in the Complaint that he appeared before the Program Committee, in the grievance that he eventually submitted to protest his removal from the Chair Shop, and which he has attached to his Complaint, he states that he appeared before the Program Committee on October 29, 2002, and was denied his request to return to the Chair Shop. On November 3, 2002, Bussey was permanently removed from the Chair Shop.

B.   POLICY AND PROCEDURE STATEMENT NO. 312

Defendants assert that Green Haven's Policy and Procedure Statement No. 312 ("P&P 312") authorized the actions taken to remove Bussey from the Chair Shop. P&P 312 sets forth the nature and function of the Program/Classification Committee and procedures for its operation. Under P&P 312, "if a supervisor deems that there is sufficient documentation that it is in the best interest of the safety and security of any personnel in a work area (employee or inmates) to reassign an individual inmate..., he/she shall submit a request in writing to the program committee for review of the situation and possible removal." (P&P 312 at V.C.2.) According to Defendants, this

7

process authorized Haubert's and Temple's actions in removing
Bussey from the Chair Shop.

The section of P&P 312 addressing "Security" provides two
ways for the Program Committee to remove an inmate from a
program assignment based on security, as opposed to performance.
(Compare id. V.E (security procedures), with id. V.D (removal
procedures based on unsatisfactory performance).)  First, the
Program Committee is authorized to remove the inmate from the
program if the inmate is issued a misbehavior report and the
disciplinary hearing disposition recommends removal.  (Id. at
V.E ¶ 1.)  Defendants admit that this paragraph did not apply to
Bussey's situation, because the misbehavior report was dismissed
on a technicality, and thus the disciplinary hearing did not
result in a recommendation to remove Bussey from the Chair Shop.
However, P&P 312 also provides that

> if, in the opinion of the inmate's supervisor, a situation
> arises which, while not constituting a direct threat to the
> safety and security of the area, nevertheless disrupts the
> operation of, or smooth functioning of that area, the
> supervisor may request program committee intervention via
> a memo.  The memo should delineate the nature of the
> concern and the potential negative consequences to the area
> if the inmate's behavior continues.  Program Committee will
> make an independent assessment of the situation and make a
> determination as to whether the inmate should remain or be
> removed and reprogrammed.

(Id. at V.E ¶ 2.)  Defendants assert that this paragraph applied
to justify Bussey's removal from the Chair Shop.  According to
Temple, Bussey was removed from the Chair Shop "solely on the

basis of Captain Haubert's determination that ... Bussey's fighting presented security concerns that would continue to disrupt the operation of the Industry Chair Shop." (Temple Decl. ¶ 12.)

C.   BUSSEY'S GRIEVANCE RECORD

On either November 4 or November 6, 2002, Bussey filed an inmate grievance complaint concerning his removal from the Chair Shop.[3] In the grievance, Bussey alleged that the denial of his request to return to the Chair Shop after the misbehavior report was dismissed was based on "prejudice and racial discrimination." (Inmate Grievance Compl. at 2; see also Compl. ¶ 16.) He also alleged that because he is Muslim, he was treated differently from other inmates who were charged with fighting but returned to their original job assignments. According to Bussey, he was forced to choose a program in which he did not want to participate. Bussey requested that the grievance committee "stop the racial practice of job discrimination towards Muslims and inmates of color" and that he be allowed to appear again before the Program Committee and given the opportunity to participate in a different program. (Inmate Grievance Compl. at 2-3.) Finally, Bussey requested that no retaliation be made against him for filing a grievance.

---

[3] The Inmate Grievance Complaint is dated November 4, 2002, but other documentation, as well as the Complaint, indicates that the grievance was filed on November 6, 2002.

According to Defendants, in response to Bussey's grievance, the investigation of the September 20, 2002 assault was reviewed, and on November 13, 2002 the review confirmed that Bussey was removed for security reasons.  On November 19, 2002, the Inmate Grievance Resolution Committee ("I.G.R.C.") "recommend[ed] that P&P 312(E) be adhered to" and that "in accordance to [sic] this P&P 312, that [Bussey] be reinstated to his Industry program."  (See I.G.R.C. Response.)  Based on the I.G.R.C. response, Bussey submitted an appeal to Superintendent William Phillips.  The appeal was assigned to the Superintendent's designee, then Deputy Superintendent Thornton, who delegated the review to then-Captain William Totten.  On December 4, 2002, the Superintendent's office denied Bussey's appeal.  According to Phillips, the refusal to authorize Bussey's return to the Chair Shop was "a necessary consequence of the security issues and operational concerns arising from the September 20, 2002 assault."  (Phillips Decl. ¶ 10.)

On December 9, 2002 Bussey appealed to the Central Office Review Committee ("C.O.R.C."), alleging that Superintendent Phillips allowed discriminatory actions against Bussey to go uncorrected by refusing to place him back into the Industry Program after the misbehavior report was dismissed.  He again alleged "ethnic and religious discrimination," and requested reinstatement into his position and reimbursement of "all back

pay and wages owed from the time of the adverse termination until the reinstatement" into the Chair Shop. (C.O.R.C. Appeal at 13.)

On January 8, 2003, "[u]pon full hearing of the facts and circumstances of [Bussey's] case," the C.O.R.C. unanimously denied Bussey's request and upheld the determination of Superintendent Phillips. (C.O.R.C. Determination.) The C.O.R.C. stated that Bussey had failed to substantiate his allegation of racial discrimination in his program removal, that he was placed on a waiting list for a programming assignment, and that he was scheduled to receive an assignment in the near future. It further stated that

CORC continues to uphold the discretion of facility administrations to make top level decisions, when necessary, for the safety, security and good order of their facilities with regards to the appropriateness of or removal from a particular program assignment for a particular inmate. The administration must make a judgment call based on experience and available information to prevent possible difficulties. CORC believes that this is sound operating procedure in order for the Program Committee to function effectively in the correctional setting.

(Id.)

On March 18, 2003, Bussey wrote to the Superintendent's office, alleging racial discrimination and requesting review of the situation and return to the Industry Program. On March 28, 2003, Phillips responded to Bussey by memorandum stating that Bussey "w[as] removed from Industry for security concerns. It was not based on any discrimination towards you. You, as an

individual, were felt to be a security risk in the Industry shop. I will not authorize your return to that job." (Phillips Ltr.)

On August 18, 2004, Bussey filed this action, suing Defendants in their official and individual capacities. In his first cause of action, Bussey alleges that Defendants caused him "to suffer physical injuries, emotional suffering, mental anguish, and the loss of his constitutional protected rights under the 1st, 5th, 6th, 9th, and 14th Amendments of the United States Constitution." (Compl. ¶ 35.) Bussey's second cause of action again alleges physical injuries, emotional suffering, mental anguish and "loss of his constitutional rights under the United States Constitution." (Compl. ¶ 37.) His third cause of action alleges intentional and negligent infliction of physical injuries, emotional suffering, mental anguish, and the loss of his constitutional rights under the United States Constitution. Bussey seeks actual and punitive damages and lost wages in the sum of $1 million, as well as costs and attorneys' fees.

Defendants' motion for summary judgment, in addition to arguing that Bussey's claims are legally deficient, asserts the defenses of official and qualified immunity, as well as lack of personal involvement by defendants Thornton and Thacker.

## II. <u>DISCUSSION</u>

A. <u>STANDARD OF REVIEW</u>

12

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A district court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. (internal citations omitted); see General Elec. Co. v. New York State Dep't of Labor, 936 F.2d 1448, 1452 (2d Cir. 1991).

On a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. See Savino v. City of New York, 331 F.3d 63, 71 (2d Cir. 2003) (citing Anderson, 477 U.S. at 255).  However, where the movant has made a properly supported summary judgment motion, the opposing party cannot simply rely upon the allegations or denials of his pleadings. Anderson, 477 U.S. at 248.  To survive a motion for summary judgment, "the

nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is ... insufficient to defeat summary judgment." Niagara Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Anderson, 477 U.S. at 252).

Where, as here, the plaintiff appears pro se, the Court must construe the plaintiff's pleadings liberally and interpret them "'to raise the strongest arguments that they suggest.'" Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). However, while the submissions of pro se litigants are liberally construed, the fact that Bussey is "proceeding pro se does not otherwise relieve [him] from the usual requirements of summary judgment." Fitzpatrick v. New York Cornell Hosp., No. 00 Civ. 8594, 2003 WL 102853, at *5 (S.D.N.Y. Jan. 9, 2003).

In order to pursue a claim over prison conditions, the Prison Litigation Reform Act ("P.L.R.A.") requires a prisoner first to exhaust available administrative remedies. 42 U.S.C.

14

§ 1997e(a).  Based on the papers submitted to the Court, the Court finds that Bussey exhausted the available administrative remedies prior to filing suit.

B.  CAUSES OF ACTION UNDER 42 U.S.C. § 1983

Liability under § 1983 requires that Defendants (1) engage in some action under color of state law (2) in a manner depriving plaintiff of rights, privileges, or immunities secured by the Constitution.  See 42 U.S.C. § 1983; Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 155 (1978).

1.  Fourteenth Amendment

a.  *Due Process Violations*

Bussey claims that because the misbehavior report was dismissed on a technicality, the allegations against him were never factually proven and he did not have an opportunity to dispute them, and thus his removal from the Chair Shop based on the facts in the misbehavior report was a violation of his due process rights.

To state a claim under 42 U.S.C. § 1983 for an alleged violation of procedural due process, Bussey must show that, as the result of conduct performed by Defendants under color of state law, Bussey was deprived of life, liberty or property without due process of law.  See Bedoya v. Coughlin, 91 F.3d 349, 351 (2d Cir. 1996).  Since there is no dispute that Defendants acted under color of state law, the Court must

15

consider only whether Bussey had a clearly protected liberty interest in his prison job assignment, and if so, whether the deprivation of that liberty interest occurred without due process of law.  See id. at 351-52.  Defendants argue that Bussey's due process claim must fail because a prison job assignment is not a constitutionally protected interest.  The Court agrees.

"A due process violation may be found only with regard to (1) a 'liberty interest' arising out of the federal Due Process Clause or state law, which is both (2) 'clearly established' (3) and deprived through denial of due process." Romer v. Morgenthau, 119 F. Supp. 2d 346, 357 (S.D.N.Y. 2000) (quoting Kelly Kare, Ltd. v. O'Rourke, 930 F.2d 170, 177 (2d Cir. 1991)). State-created liberty interests protected by the Due Process Clause generally are those whose deprivation imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. Sandin v. Connor, 515 U.S. 472, 483-84 (1995).  Removal from a particular prison job assignment does not satisfy this standard.  It is well settled that "in New York a prisoner has no protected liberty interest in a particular job assignment." Frazier v. Coughlin, 81 F.3d 313, 318 (2d Cir. 1996); Faison v. Hash, No. 03 Cv. 6475P, 2004 WL 944523, at *4 (W.D.N.Y. Apr. 23, 2004); McNeil v. Keane, No. 95 Civ. 2595, 1998 WL 148364, at *3 (S.D.N.Y. Mar. 30, 1998)

(removal from prison job prior to hearing is not due process violation because as a matter of law, a prisoner has no protected liberty interest in a particular job assignment); <u>Saulter v. Hanslmaier</u>, No. 94 Civ. 6855, 1997 WL 177887, at *3 (S.D.N.Y. Apr. 14, 1997) (refusal to return prisoner to job held prior to keeplock confinement, despite fact that misbehavior report was never filed against him and no hearing was held, did not violate due process because in New York a prisoner has no protected liberty interest in a particular job assignment).  Nor does Bussey's Chair Shop position amount to a liberty interest conferred by the Due Process Clause itself.  The Due Process Clause does not protect against "every change in the conditions of confinement having a substantial adverse impact" on inmates, if those changes are "'within the normal limits or range of custody which the conviction has authorized the State to impose.'"  <u>Sandin</u>, 515 U.S. at 478 (quoting <u>Meachum v. Fano</u>, 427 U.S. 215, 225 (1976)).  Instead, prisoners' liberty interests arising from the Due Process Clause itself are more limited, protecting prisoners, for example, from punishments that are "qualitatively different" from those punishments characteristically suffered by those convicted of crime, with "stigmatizing consequences."  <u>Sandin</u>, 515 U.S. at 479 n.4. Bussey's removal from the Chair Shop was well within the terms of confinement ordinarily contemplated by his prison sentence.

Bussey's argument that the Chair Shop position under Corcraft was not a prison job but "actual employment" implicating a liberty interest is without merit. (Bussey's Mem. of Law, dated July 20, 2005, at 5). See Allah v. Juchnewioz, No. 93 Civ. 8813, 2003 WL 1535623, at *1 (S.D.N.Y. Mar. 24, 2003) (identifying Corcraft as trade name of New York Department of Correctional Services' manufacturing division); Thomas v. New York State Dept. of Corr. Servs., No. 00 Civ. 7163, 2002 WL 31164546, at *1 (S.D.N.Y. Sept. 30, 2002) (identifying Corcraft as manufacturing division of New York Department of Correctional Services).

Because the Court concludes that Bussey cannot demonstrate a deprivation of a constitutionally protected and recognized liberty interest, the Court need not reach the issue of whether Defendants' suspension of Bussey from the Chair Shop after the misbehavior report was dismissed on a technicality violated due process of law. See Palmer v. Richards, 364 F.3d 60, 64 n.2 (2d Cir. 2004) ("Of course, a prisoner must first show that the state created a liberty interest, by statute or regulation, before he can show that the interest was infringed."); Frazier v. Coughlin, 81 F.3d 313, 318 (2d Cir. 1996) ("[S]ince [the prisoner] failed to establish that he had a protected liberty interest in remaining free from confinement in the CSU under Sandin, he cannot assert a claim that he was denied due process

in the procedures that confined him there.").  The Court notes, however, that Bussey did, by his own admission, appear before the Program Committee on October 29, 2002 and that P&P 312 authorizes the Program Committee to remove an inmate from a position even in the absence of a misbehavior report and disciplinary hearing (P&P 312 at V.E ¶ 2.).  Moreover, although Bussey states in his opposition papers that Defendants did not allow him "the opportunity to present evidence at the hearing of this matter" to dispute his involvement in the assault, Bussey has not indicated in any way what evidence he would produce. (Bussey Summ. J. Aff. at 3 ¶ 10.)   "Clearly, plaintiff is unsatisfied with the programming decisions.  Nevertheless, the actions attributed to these defendants fall within those decisions that must be afforded 'great deference' to prison officials who are charged with the 'difficult responsibility' of maintaining order in prisons."  Faison v. Hash, No. 03 Cv. 6475P, 2004 WL 944523, at *4 (W.D.N.Y. Apr. 23, 2004) (quoting Young v. Coughlin, 866 F.2d 567, 570 (2d Cir. 1989)).

        b.  *Equal Protection*[4]

      Bussey's Complaint contains extensive allegations of racial and religious discrimination.  See Compl. ¶ 16 (alleging that

---

[4] Defendants state that Bussey's equal protection claims arise under 42 U.S.C. § 1981, rather than 42 U.S.C. § 1983.  See Def. Mem. at 17 n.14.  However, Bussey's complaint asserts that it is brought pursuant to § 1983. Moreover, Defendants' position ignores Bussey's allegations of religious discrimination, for which § 1983, rather than § 1981, is the appropriate statutory vehicle.  See Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998).

"minorities, particularly Muslims have been treated" in a "near-like, slave manner" "in the Industry Program in comparison to whites that also participate in the Industry Program"); ¶ 18 (alleging that "several Caucasians" were reinstated into Industry Program after having been found guilty of misbehavior reports and after having served keep-lock time); ¶ 19 (alleging that minorities in Industry Program have been treated in "slave-like manner"); ¶ 20 (alleging that the majority of disciplinary actions are directed toward minorities while Caucasians in the Industry Program are given the best jobs and salaries); ¶ 21 (alleging that defendants have a policy of systematic discrimination against blacks and that defendants have allowed these actions to continue); ¶ 24 (alleging that Green Haven has a "long-standing racial imbalance" and that defendants have made clear "their dislike for blacks" through a practice of "allowing whites to stay in the shop, after clear violations have been established"); ¶ 28 (alleging removal from Chair Shop in a discriminatory manner).

The Equal Protection Clause directs state actors to treat similarly situated people alike. Giano v. Senkowski, 54 F.3d 1050, 1057 (2d Cir. 1995); Allah v. Juchnewioz, No. 93 Civ. 8813, 1999 WL 562100, at *5 (S.D.N.Y. July 30, 1999). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with

other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)). To prove an equal protection violation, a plaintiff must demonstrate intentional or purposeful discrimination, directed at an identifiable or suspect class. See Giano, 554 F.3d at 1057; Allah, 1999 WL 562100, at *5. Proof of racially discriminatory intent or purpose is required. Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977); Thomas v. City of New York, 143 F.3d 31, 37 (2d Cir. 1998). A plaintiff can plead intentional discrimination on the basis of race in several ways, including by identifying a law or policy that expressly classifies persons on the basis of race, a facially neutral law or policy that has been applied in an intentionally discriminatory manner, or a facially neutral statute or policy that has an adverse effect and is motivated by discriminatory animus. See Pyke v. Cuomo, 258 F.3d 107, 110 (2d Cir. 2001); Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000).

Bussey's allegations are almost entirely conclusory, with no facts to support his claims that he and other non-white and

Muslim inmates were discriminated against on the basis of race or religion.   However, Bussey does point to two particular incidents of allegedly unequal treatment.   Specifically, in his grievance, which is attached to his Complaint, Bussey alleges that two white and non-Muslim inmates, identified as James Thomas ("Thomas") and M. Harold ("Harold"), were involved in fights, charged with fighting, and returned to their original program.   In addition, Bussey alleges that Defendants have a policy of treating white and non-white inmates differently with regard to prison jobs.   See, e.g., Compl. ¶ 20 (alleging that the majority of disciplinary actions are directed toward minorities while Caucasians in the Industry Program are given the best jobs and salaries); ¶ 21 (alleging that Defendants have a policy of systematic discrimination against blacks and that Defendants have allowed these actions to continue); ¶ 24 (alleging that Green Haven has a "long-standing racial imbalance" and that Defendants have made clear "their dislike for blacks" through a practice of "allowing whites to stay in the shop, after clear violations have been established"). Reading Bussey's claims generously, he appears to be alleging that similarly situated inmates are treated differently, and that Defendants have a policy of allowing white and non-Muslim inmates, but not non-white, Muslim inmates, to return to the Industry Program after rule violations.

In LaBounty v. Adler, the Second Circuit held that a black inmate stated an equal protection claim when he alleged both that (1) three similarly situated white inmates were given work assignments without having to first complete a 90-day educational program, while the plaintiff had to first complete a 90-day educational program, and (2) that "all persons assigned as institution electricians are non-Black and there are witnesses who can testify that it has been that way for the past ten (10) years that they know of." 933 F.2d 121, 123 (2d Cir. 1991). Bussey's allegations are similar: he has alleged that two white inmates were returned to their Industry positions after being involved in a fight, while he was not, and that Green Haven has a longstanding racial imbalance and policy of treating non-white, Muslim inmates and white, non-Muslim inmates differently after misbehavior reports are issued. Thus, under LaBounty, Bussey's allegations would be enough sustain an equal protection claim against a motion to dismiss. See also James v. Artuz, No. 93 Civ. 2056, 1994 WL 174005, at *8-*9 (S.D.N.Y. May 4, 1994) (finding that black prisoner had stated an equal protection claim when prisoner alleged that he was denied a prison job assignment after being disciplined for fighting but white inmate was not denied prison job assignment after being disciplined for fighting).

23

The procedural posture of this case is different from that in LaBounty, however, in that the Court here is deciding a motion for summary judgment.  While Bussey's allegations may have been enough to survive a motion to dismiss, upon summary judgment such allegations must be supported by specific facts raising a genuine issue for trial.  Fed. R. Civ. P. 56(e).

In his affidavit submitted January 18, 2006 in response to Defendants' summary judgment motion, Bussey states that "defendants retain relevant documentation, through daily used committees, Grievances, and other officially used logs, and reports, demonstrating a pre-disposition towards Muslim inmates, and 'Minority inmates in particular', being discriminated against by the defendants in the industry program" (Bussey Reply Aff. ¶ 7).  Moreover, in an earlier affidavit submitted to the Court after the Court converted the motion to dismiss into one for summary judgment, Bussey states that "his religious belief's [sic], race and color was the main factors of removing him from a program he has maintained for many years, and the numbers do not lie if they are released, thus, by comparing the before placement, placement, removal numbers to now -- after this action was filed -- this Court will note that infliction of different group's of Prisoner's." (Bussey's Aff. in Opp'n ¶ 5.) This appears to be an argument that by analyzing Defendants' records to see which prisoners have been reinstated in the

industry program after misbehavior reports and which have not, Bussey could show a statistical difference in treatment. He has requested additional discovery, presumably of these records.[5] Statistical evidence can be used to demonstrate disparate impact and, if the statistics are large enough, to infer discriminatory intent. See Santiago v. Miles, 774 F. Supp. 775, 798 (W.D.N.Y. 1991). However, in an individual disparate treatment case, unlike in a class action or case alleging widespread disparate treatment, statistics alone do not suffice to establish discriminatory intent. See Martin v. Citibank, N.A., 762 F.2d 212, 218 (2d Cir. 1985) (noting that statistical proof alone cannot ordinarily establish a prima facie case of disparate treatment under Title VII or § 1981); Zahorik v. Cornell Univ., 729 F.2d 85, 95 (2d Cir. 1984) (evidence showing that more male candidates than female candidates were granted tenure was insufficient to prove that the particular plaintiffs were discriminated against); Hudson v. Int'l Bus. Machines Corp., 620 F.2d 351, 355 (2d Cir. 1980) (finding no error in district court determination that statistical data alone would not establish a prima facie case in an individual's disparate treatment action);

---

[5] Defendants interpret Bussey's request for documents to be limited only to the grievances of the other aggressors in the September 20, 2002 assault. (Defs. Reply Mem., dated Sept. 8, 2005, at 7 n.3). However, in light of Bussey's assertion that Defendants' daily logs and records would evidence discrimination, and the need to interpret pro se pleadings liberally, the Court finds that Defendants' interpretation of Bussey's request is too narrow.

Drake v. Delta Air Lines, No. 94 Cv. 5944, 2005 WL 1743816, at *6 (E.D.N.Y. July 21, 2005) (noting that in an individual disparate treatment claim, "[s]tatistics alone are insufficient... because an individual plaintiff must prove that he or she in particular has been discriminated against"; Zenni v. Hard Rock Cafe Int'l, Inc., 903 F. Supp. 644, 654 (S.D.N.Y. 1995) ("[S]tatistical evidence of an employer's general hiring practices is insufficient to prove that a particular plaintiff was discriminated against."). Rather, statistical evidence can be used along with other evidence to prove discriminatory intent. See Catanzaro v. Weiden, 140 F.3d 91, 96 (2d Cir. 1998) (statistics showing racial disparity combined with other evidence including comments by decisionmaker provided reasonable inference of a systematic policy of racial discrimination precluding summary judgment on equal protection).

Thus, absent other sufficient evidence, statistics that might be admissible as probative circumstantial evidence of discrimination are not enough to establish a genuine factual dispute. Accordingly, even assuming that the widespread discovery into Defendants' records that Bussey has requested would result in a statistically probative finding that white and non-white inmates were treated differently in regard to placement in the Industry Program, without other evidence of intent the Court is not inclined to send Bussey on a fishing

expedition through Defendants' files based merely on Bussey's assertion that "the numbers will not lie."  Something more is needed before warranting such large discovery.

As other evidence of intentional discrimination, Bussey has pointed to the allegedly disparate treatment afforded himself as compared to white inmates Harold and Thomas, who were involved in a fight on September 4, 2002, only a few weeks before the incident in which Bussey was involved, and allowed to return to their jobs.   Defendants argue that these inmates did not receive preferential treatment because, by Bussey's own admission, these inmates received keeplock time rather than merely being reassigned to a different job.  (Defs.' Summ. J. Mem., dated June 3, 2005, at 20.)  However, Bussey's claim is not that white inmates are not punished for infractions, but rather, that the punishments received by white versus non-white inmates differ:  that white inmates are allowed to return to the Industry Program while non-white inmates are not.  That Harold and Thomas received keeplock time therefore is irrelevant to Bussey's claim.

Defendants also argue that the programming and disciplinary history of these two inmates reveals that the incident in which they were involved was qualitatively different from Bussey's, in that the fight was less serious and documentation of the fight suggests that the reason for it was that one of the two inmates

had not been taking his medication.  Bussey has stated that he cannot meaningfully respond to Defendants' arguments on the treatment of Thomas and Harold absent discovery.  Summary judgment is "'particularly inappropriate' where it is sought on the basis of 'the inferences which the parties seek to have drawn [as to] questions of motive, intent, and subjective feelings and reactions.'"  Sam Wong & Son, Inc. v. New York Mercantile Exch., 735 F.2d 653, 678 (2d Cir. 1984) (quoting Friedman v. Meyers, 482 F.2d 435, 439 (2d Cir. 1973)) (finding it appropriate to grant the plaintiff limited discovery into the issue of bad faith prior to deciding the issue upon summary judgment).  Because Bussey had already requested discovery prior to Defendants' filing of their summary judgment motion, and because it is not beyond the realm of possibility that a Court could find that a prisoner has raised a genuine issue of fact as to whether prison officials imposed harsher punishments for violations of prison regulations based on racial discrimination, see, e.g., James, 1994 WL 174005, at *8-*9, the Court finds that it would be inappropriate to conclude that Bussey has not raised a genuine issue of fact as to intentional discrimination without affording him the opportunity to conduct limited discovery into the circumstances surrounding this incident and into Defendants' intent.  The outcome of this discovery may or may not enable

Bussey to raise a genuine issue of fact as to Defendants' allegedly discriminatory intent.

The Court therefore will allow Bussey to submit interrogatories to Defendants on the circumstances surrounding his removal from the Industry Program, as well as the removal of inmates Thomas and Harold from the Industry Program and their subsequent reinstatement to that assignment.  In addition, in his first affidavit filed after the Court converted Defendants' motion into one for summary judgment, Bussey requested that a "hearing or date be set for the taking of stenograph depitions [sic] from a list of witnesses that can support <u>all</u> claims this Plaintiff has made." (Bussey's Aff. in Opp'n, at 2-3.)  Reading Bussey's request generously, the Court will also provide Bussey with the opportunity to submit affidavits from any knowledgeable witnesses to specific instances of unequal treatment relevant to Bussey's equal protection claim.  Defendants may also submit affidavits in response.  After the conclusion of this discovery, Defendants may move again for summary judgment.  If this discovery raises a genuine issue of fact as to Defendants' intent, the Court may order trial on the merits or supplemental discovery as appropriate.

2.  <u>Retaliation</u>

Bussey also alleges that Defendants retaliated against him for filing his grievance.  Retaliation against a prisoner for

pursuing a grievance violates the right guaranteed by the First and Fourteenth Amendments to petition the government for the redress of grievances and is actionable under § 1983.   See Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996).

Prisoners' claims of retaliation must be examined with care because they are "'prone to abuse' since prisoners can claim retaliation for every decision they dislike." Graham, 89 F.3d at 79 (quoting Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)); Freeman v. Goord, No. 02 Civ. 9033, 2005 WL 3333465, at *5 (S.D.N.Y. Dec. 7, 2005).   In order to survive summary judgment on a retaliation claim, a plaintiff bears the burden of showing two genuine issues of material fact:  first, that the plaintiff engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials.   See Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003); Graham, 89 F.3d at 80 (citing Mount Healthy Sch. Dist. v. Doyle, 429 U.S. 274, 287 (1977)).   Even if the plaintiff meets this burden, the retaliation claim will not survive summary judgment if the defendant meets its burden of showing no genuine issue of fact that the prisoner would have received the same punishment even if it had not been improperly motivated.   See Bennett, 343 F.3d at 137; Graham, 89 F.3d at 79.   "A finding of sufficient permissible reasons to justify state action is 'readily drawn in

the context of prison administration where... prison officials have broad administrative and discretionary authority.'" Graham, 89 F.3d at 79 (quoting Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994)).  A complaint of retaliation that is "wholly conclusory" can be dismissed on the pleadings alone.  Id.

Bussey satisfies the first requirement because, as already noted, his filing of a grievance is constitutionally protected conduct.  See Graham, 89 F.3d 75; Franco v. Kelly, 854 F.2d 584 (2d Cir. 1988).  However, Bussey fails to raise a genuine issue of material fact that his filing of a grievance was a substantial or motivating factor in his suspension from the Chair Shop.  First, Bussey's initial removal from the Chair Shop occurred prior to his filing of the grievance. (See Ex. 5 at 3 (indicating that Chair Shop assignment ended on November 3, 2002); Compl. ¶ 16 (Bussey filed his grievance on November 6, 2002).)  Second, Bussey offers no evidence, other than the adverse administrative decision itself, to demonstrate that the refusal to authorize his return to the Chair Shop was motivated by his pursuit of the grievance.  The refusal to authorize his return to the Chair Shop, in itself, does not raise an inference that Bussey's filing of a grievance was a substantial or motivating factor in the decision.  Rather, the record indicates that Defendants' decision not to return Bussey to the Chair Shop was based on the finding that he was a security risk.  See Ex.

31

6 attached to Totten Decl., at 7 (form signed by Thornton stating that "[i]nvestigation indicates that grievant was removed from program for security concerns"); <u>id.</u> at 9 (Inmate Grievance Program investigation form stating that "[g]rievant was removed from his program based on security concerns"); <u>id.</u> at 18 (C.O.R.C. decision upholding Superintendent's decision not to return Bussey to program and "uphold[ing] the discretion of facility administrations to make top level decisions, when necessary, for the safety, security and good order of their facilities with regards to the appropriateness of or removal from a particular program assignment for a particular inmate"); Phillips Ltr. (Phillips letter to Bussey stating that Bussey "w[as] removed from Industry for security concerns.... You, as an individual, were felt to be a security risk in the Industry shop.  I will not authorize your return to that job.").  Thus, Bussey has failed to raise a genuine issue that his filing of a grievance was a substantial or motivating factor in Defendants' decision to not return him to the Chair Shop, and accordingly his retaliation claims cannot survive summary judgment.

    3.  <u>Fifth, Sixth, Eighth and Ninth Amendment Claims</u>

    The Court finds that Bussey does not state any legally sufficient claims under the Fifth, Sixth, Eighth and Ninth Amendments.

Bussey's citation to the Fifth Amendment is inapposite. Bussey's due process claims are against state, not federal, actors, and thus the Fourteenth Amendment, rather than the Fifth Amendment, applies to these claims. See Dusenbery v. United States, 534 U.S. 161, 167 (2002). Nor does Bussey raise any other cognizable claim under the Fifth Amendment.

Similarly, Bussey does not allege any denial of access to the courts or right to counsel in a criminal proceeding or any other right that would implicate the Sixth Amendment.

Bussey does not cite to the Eighth Amendment but, construing his pro se pleadings liberally, the Court reads the Complaint as attempting to state a violation of his Eighth Amendment right to be free from cruel and unusual punishment. However, the conduct that Bussey challenges – permanent suspension from the Chair Shop – does not arise to the type of conduct implicating Eighth Amendment. See La Bounty v. Adler, 933 F.2d 121, 124 (2d Cir. 1991) (holding that an inmate's exclusion from the prison's maintenance electrician program did not establish Eighth Amendment violation); Allah v. Juchnewioz, No. 93 Civ. 8813, 1999 WL 562100, at *5 (S.D.N.Y. July 30, 1999) (deprivation of participation in college program due to keeplock confinement was not sufficiently severe to constitute cruel and unusual punishment).

33

Finally, Bussey's citation to the Ninth Amendment is inappposite, as he has not presented any facts implicating any right guaranteed to him by the Ninth Amendment.  Moreover, the Ninth Amendment refers only to unenumerated rights, while claims under § 1983 must be premised on specific constitutional guarantees.  See Khalild v. Reda, No. 00 Civ. 7691, 2003 WL 42145, at *6 (S.D.N.Y. Jan. 23, 2003).

   4.   Conspiracy

Bussey also alleges that Defendants conspired to deny his constitutional rights.  To support a § 1983 conspiracy claim, a plaintiff must demonstrate (1) an agreement between two or more state actors or a state actor and a private party, (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages.  See Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999).  Thus, a plaintiff must show that "defendants 'acted in a willful manner, culminating in an agreement, understanding or 'meeting of the minds,' that violated [his] rights, privileges or immunities secured by the Constitution or federal courts.'" Shabazz v. Pico, 994 F. Supp. 460, 467 (S.D.N.Y. 1998) (quoting Hameed v. Pundt, 964 F. Supp. 836, 839 (S.D.N.Y. 1997)); see Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000). "'[C]omplaints containing only conclusory, vague, or general

allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed.'" Ciambriello, 292 F. 3d at 325 (quoting Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir.1993)).  However, conspiracies are "by their very nature secretive operations, and may have to proven by circumstantial, rather than direct, evidence." Pangburn, 200 F.3d at 72 (internal quotations omitted).

Bussey asserts that Defendants "conspired to deny [his] constitutional rights" when they "were made aware of the deprivations, through daily used documents, committee's, policies, and procedures, and failed to correct the wrongdoing, taking actual participation in the denial of constitutional rights." (Compl. ¶ 22.)  He also asserts that Defendants "conspired and continue to conspire to act in the furtherance of the object of the conspiracy, while acting under the color of state law, for the sole purpose of depriving plaintiff, directly or indirectly of equal protection, due process of laws, whereby plaintiff was grievously injured in his person, and deprived of having, and exercising his substantive and procedural rights and privileges as a citizen of the United States." (Compl. ¶ 33.) However, Bussey has proffered no evidence to support these assertions that Defendants conspired to violate his rights. These assertions therefore cannot withstand summary judgment.

See Shabazz, 994 F. Supp. at 467; Ahlers v. Carrillo, No. 94 Civ. 7945, 1997 WL 167049, at *4 (S.D.N.Y. Apr. 9, 1997).

Moreover, to prove a conspiracy claim under § 1983, plaintiff must demonstrate not only a conspiracy itself, but also actual deprivation of a constitutional right. See Romer, 119 F. Supp. 2d at 363; Goldfine v. Kelly, 80 F. Supp. 2d 153, 163-64 (S.D.N.Y. 2000) ("To establish a conspiracy claim under § 1983 plaintiff must show not only that defendants acted in a willful manner, culminating in an agreement, understanding, or 'meeting of the minds,' but also must prove an actual violation of his federal rights.") (internal quotations and citations omitted).   Without deprivation of a federal constitutional right, "there can be no civil rights conspiracy to deprive that right." Young v. County of Fulton, 160 F.3d 899, 904 (2d Cir. 1998); Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) (noting that a § 1983 conspiracy lawsuit "will stand only insofar as the plaintiff can prove the sine qua non of a § 1983 action: the violation of a federal right"); see Romer, 119 F. Supp. 2d at 363-64.   As discussed above, with the exception of his equal protection claim, Bussey has failed to proffer any facts supporting a reasonable inference that Defendants violated his constitutional rights.   His conspiracy claim therefore cannot survive summary judgment.

C.   INTENTIONAL OR NEGLIGENT INFLICTION OF PHYSICAL AND EMOTIONAL INJURY

Bussey claims that by depriving him of his constitutional rights, Defendants caused him to suffer physical injuries, emotional suffering and mental anguish. Bussey's allegations of physical injury are unsubstantiated. Moreover, under the P.L.R.A., a prisoner may not recover damages for mental or emotional injury for a constitutional violation without a showing of actual physical injury. See 42 U.S.C. § 1997e(e); Thompson v. Carter, 284 F.3d 411, 417 (2d Cir. 2002). Bussey has not made a showing of even a de minimis physical injury, as required by the P.L.R.A. Cf. Liner v. Goord, 196 F.3d 132, 135 (2d Cir. 1999). Thus, his claims for damages for mental and emotional injury must be dismissed.

D.   ELEVENTH AMENDMENT IMMUNITY, QUALIFIED IMMUNITY, AND PERSONAL INVOLVEMENT

Defendants also assert that they are entitled to both Eleventh Amendment and qualified immunity, and that Defendants Thornton and Thacker were not personally involved in the actions that are the subject of Bussey's claims. Because the Court is allowing Bussey's equal protection claim to go forward, the Court will consider these defenses.

1.   Eleventh Amendment

To the extent that Bussey is suing Defendants in their official capacities, his claims are barred by the Eleventh Amendment. See Kentucky v. Graham, 473 U.S. 159, 169 (1985)

(holding that a claim for damages against State officials in their official capacity is a claim against the State and is therefore barred by the Eleventh Amendment); Davis v. New York, 316 F.3d 93, 101 (2d Cir. 2002) (holding that a prisoner's § 1983 claims for damages against individual prison officials in their official capacities are barred by Eleventh Amendment).

    2.  Qualified Immunity

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Wilson v. Layne, 526 U.S. 603, 609 (1999); Ayers v. Ryan, 152 F.3d 77, 82 (2d Cir. 1998). Summary judgment may be granted on this ground if the defendant shows that (1) the asserted right was not clearly established, or (2) it was nonetheless objectively reasonable for the official to believe the conduct did not violate it. Ayers, 152 F.3d at 82.

Defendants's only argument on qualified immunity is that since Bussey had no clearly established right to a particular prison job, his removal from the Chair Shop could not have violated clearly established law and it was objectively reasonable for Defendants to believe that their alleged actions did not violate Bussey's constitutional rights. (Defs. Summ. J.

Mem. at 24.)   However, this argument addresses qualified
immunity only as to Bussey's due process claims.  A "[p]laintiff
has no right to any particular prison job, but prison officials
cannot discriminate against him on the basis of his race in work
assignments."   LaBounty v. Adler, No. 89 Civ. 4242, 1999 WL
961776, at *2 (S.D.N.Y. Oct. 21, 1999); see also Walker v.
Gomez, 370 F.3d 969, 973 (9th Cir. 2003) ("While the Due Process
Clause of the Fourteenth Amendment does not create a property or
liberty interest in prison employment, racial discrimination in
the assignment of jobs violates equal protection.") (citations
and quotations omitted).  The relevant inquiry here is not
whether Bussey had a clearly established right to a particular
prison job, but whether Bussey's right not to be discriminated
against on the basis of race or religion in the placement of job
assignments was clearly established at the time of Defendants'
actions and, if so, whether it was objectively reasonable for
Defendants to believe that their conduct did not violate that
clearly established right.

A right is clearly established if (1) the underlying law is
defined with reasonable clarity, (2) the Supreme Court or the
Second Circuit recognizes that right, and (3) a reasonable
defendant would understand that his conduct was unlawful.
Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003).
"Prisoners are protected under the Equal Protection Clause of

the Fourteenth Amendment from invidious discrimination based on race." Wolff v. McDonnell, 418 U.S. 539, 556 (1974). In light of this unequivocal statement, as well as the Second Circuit's holding in LaBounty that a prisoner had stated an equal protection claim for racially discriminatory treatment in the assignment of prison jobs, see 933 F.2d at 123, the Court finds that Bussey's right to not be discriminated against in the assignment of prison jobs on the basis of race was clearly established at the time of Defendants' actions. See James v. Artuz, No. 93 Civ. 2056, 1994 WL 174005, at *9 (S.D.N.Y. May 4, 1994) (denying qualified immunity to program committee counselor when prisoner provided evidence "from which a rational jury could conclude that she participated in a deprivation of Plaintiff's clearly established equal protection rights with regard to job assignments").

The Court must next consider whether it was objectively reasonable for Defendants to believe that their actions did not violate that right. "Though the qualified immunity inquiry is generally an objective one, a defendant's subjective intent is indeed relevant in motive-based constitutional torts.... Otherwise, defendants in such cases would always be immunized from liability so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds.'" Johnson v. Ganim, 342 F.3d 105, 117 (2d

Cir. 2003).   Here, because the Court is allowing further development of the record on Defendants' intent, the Court defers consideration of this question until after discovery as to Defendants' intent has been completed.   See Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003) ("Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail."); Mandell v. County of Suffolk, 316 F.3d 368 (2d Cir. 2003) ("Where specific intent of a defendant is an element of plaintiff's claim under clearly established law, and plaintiff has adduced sufficient evidence of that intent to defeat summary judgment, summary judgment on qualified immunity grounds is inappropriate.").

   3.   Personal Involvement

   Defendants argue that defendants Thornton and Thacker were not personally involved in the constitutional deprivations that Bussey alleges.   "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."   Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotations omitted)).   Plaintiff must show more than "mere linkage in the prison chain of command," and the doctrine of respondeat superior does not apply.   Richardson v. Goord, 347

F.3d 431, 435 (2d Cir. 2003).  Instead, personal involvement of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon, 58 F.3d at 873.

The record indicates that Thornton's involvement consisted of being assigned by Superintendent Phillips to review Bussey's I.G.R.C. appeal and then delegating the review to Totten. Thornton then signed the decision to reject Bussey's appeal to return to the Chair Shop based on Totten's investigation. (See Compl. ¶ 6; p. 7 of Ex. 6 attached to Totten Decl.; Thornton Decl. ¶¶ 3-7.)  Referring a matter to a subordinate for investigation is not enough to support a claim of personal involvement. See Rivera v. Pataki, No. 04 Civ. 1286, 2005 U.S. Dist. LEXIS 2747, at *82 (S.D.N.Y. Feb. 7, 2005) (DOC Commissioner's referral of matter to subordinate for response is insufficient to constitute personal involvement).  However, review of an inmate's case does constitute personal involvement. Id. at *83; James, 1994 WL 174005, at *7.  Thornton's signature suggests at least some level of review of Bussey's case.  Thus,

42

on the record as it currently stands, the Court cannot conclude that there is no genuine issue of material fact as to Thornton's involvement.  Bussey has not, however, had discovery on this issue.  The Court therefore denies summary judgment for Thornton in this regard without prejudice, but will allow Bussey to submit interrogatories as to Thornton's personal involvement in the decision to not return him to the Chair Shop, and will allow Thornton to move again for summary judgment at the conclusion of this discovery.

In contrast, the record does not indicate any involvement by Thacker in any constitutional deprivation against Bussey. Rather, Thacker was assigned by Thornton to review correspondence from <u>another</u> inmate, identified as Jackson, who was involved in the same fight as Bussey, and, moreover, Thacker delegated the inquiry to Totten.  (<u>See</u> Thacker Decl. ¶¶ 3-5.) Bussey therefore has not sufficiently alleged personal involvement by Thacker.  Therefore, the Court grants summary judgment dismissing Bussey's claims against Thacker.

E.   <u>REQUEST FOR ADDITIONAL TIME FOR DISCOVERY AND LEAVE TO AMEND</u>

Simultaneously with his response to Defendants' summary judgment motion, Bussey moved for discovery and to amend his complaint.  Bussey's request may be understood as a Rule 56(f) motion to obtain further discovery to oppose Defendants' summary judgment motion.  Assuming Bussey is arguing that further

43

discovery would allow him to defend against the instant motion, with the exception of the equal protection claim, as discussed above, Bussey has failed to indicate any specific discoverable information that would raise a material issue of fact sufficient to overcome Defendants' motion, and therefore the Court rejects his request for discovery.   See Mason Tenders Dist. Council Pension Fund v. Messera, 958 F. Supp. 869, 894 (S.D.N.Y. 1997) ("[A] court can reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered." (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994)).

It is well settled in this Circuit that a motion for further discovery under Rule 56(f) may not be granted unless the moving party submits an affidavit satisfactorily explaining "[1] the nature of the uncompleted discovery; [2] how the facts sought are reasonably expected to create a genuine issue of material fact; [3] what efforts the affiant has made to obtain those facts; and [4] why those efforts were unsuccessful." Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994).   Moreover, even if the affidavit purports to satisfy all these conditions, "Rule 56(f) is not a shield against all summary judgment motions....   [A] bare assertion that the evidence supporting a plaintiff's allegation is in the hands of

the defendant is insufficient to justify a denial of a motion for summary judgment under Rule 56(f)." Id. at 1138 (internal citations and quotations omitted).

Bussey makes several discovery requests. First, Bussey states that Defendants "retain relevant documentation, through daily used committees, Grievances, and other officially used logs, and reports, demonstrating a pre-disposition towards Muslim inmates, and 'Minority inmates in particular', being discriminated against by the defendants in the industry program." (Bussey Summ. J. Aff. at 2-3 ¶ 7.) As already discussed above, such information is insufficient to support Bussey's claim absent other evidence of intentional discrimination, and Bussey has not presented any facts or allegations warranting a fishing expedition into discovery of other evidence that could support his claims of intent. However, should the limited discovery that the Court has allowed as regards Bussey's equal protection claim produce evidence sufficient to raise a genuine issue of fact as to Defendants' intentional discrimination against Bussey, the Court will reconsider whether further discovery into Defendants' records is warranted.

Second, Bussey alleges, again, that race and religion played a role in Defendants' decision to remove him from the Chair Shop (id.), and that he "will be able to support his

claims further, after he has successfully completed discovery from the defendants." (Id. at 4-5 ¶ 13.) Bussey then requests "Depositions of each defendant, relevant to their actions on prior occasions, and their willingness to forego rules, Policies, and Procedures, in depriving inmates protected Right's. Plaintiff believes Defendants, on prior occasions have either failed to act, when aware of conditions demonstrating discriminatory practices, and failed to protect inmates from such unlawful actions, by playing an active part in a deprivation of Constitutional Rights." (Id. at 5 ¶ 14.) In his accompanying memorandum of law, Bussey states that Defendants "are in possession of several grievances of several other inmates, relevant to the defendants actions prior, during, and after this incident, and cannot put forth a sufficient case, without obtaining this information from the defendants, and the records maintained by the Department of Corrections." (Bussey's Mem. of Law, dated July 20, 2005, at 3.) Bussey has not given any indication that his belief in the existence of more evidence is not speculative. Even reading his pleadings liberally, his request appears to be no more than a request for permission to look through defendants' files to see if he can uncover discriminatory actions. The Court therefore denies this request for discovery, subject to reconsideration pending the result of the limited discovery that the Court has already granted.

46

To the extent that Bussey is arguing that additional discovery would allow him to amend his complaint to state a viable claim, the Court is similarly unpersuaded to grant Bussey discovery.  The defects in Bussey's complaint do not stem solely from a lack of factual support, but are also the result of the legal deficiency of his claims.  "Discovery is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support."  Lituma v. United States, No. 04 Civ. 8955, 2005 WL 1705088, at *2 (S.D.N.Y. July 18, 2005) (internal quotation marks omitted).  Bussey is entitled to proceed with discovery only if the claims as stated in the Complaint are legally viable, which, with the exception of the equal protection claim, they are not, and therefore the Court denies Bussey's request for discovery as to all other claims in its entirety.

Although under Rule 15(a) a plaintiff may amend a complaint once without leave of Court prior to the filing of a responsive pleading, the Court has dismissed Bussey's Complaint as to all claims except the equal protection claims.  As to these claims, Bussey's "absolute right to amend terminate[d] upon the dismissal of [his] complaint. . . . Dismissal of a complaint functions much as would a responsive pleading.  Each side and the court will have put so much effort into the motion to

47

dismiss that the litigation can hardly be considered a clean slate for purposes of amendment." Stephenson v. Dow Chem. Co. (In re Agent Orange Prod. Liab. Litig.), 220 F.R.D. 22, 24 (S.D.N.Y. 2004); see Elfenbein v. Gulf & W. Indus., Inc., 590 F.2d 445, 448 n.1 (2d Cir. 1978) (holding that a plaintiff's automatic "right terminates upon the granting of the motion to dismiss"); Swan v. Board of Higher Educ., 319 F.2d 56, 60-61 (2d Cir. 1963) ("[O]nce . . . [a] judgment dismissing the original complaint had been entered, the right granted to plaintiff by Rule 15(a) of the Federal Rules of Civil Procedure to amend his complaint once as a matter of course was at an end. . . . Thereafter, the pleading could be amended only with leave of the court." (internal quotation marks and citations omitted)).

Although Bussey is proceeding in this matter pro se, and "a pro se litigant in particular 'should be afforded every reasonable opportunity to demonstrate that he has a valid claim,'" Dluhos v. Floating & Abandoned Vessel, 162 F.3d 63, 69-70 (2d Cir. 1998) (citing Satchell v. Dilworth, 745 F.2d 781, 785 (2d Cir. 1984)), the Court denies Bussey leave to amend his Complaint. See Swan, 319 F.2d at 61. Bussey has given no indication as to how he would amend his Complaint to state a valid claim were this Court to grant him leave to do so. He has only stated the vague hope that through discovery he might uncover a claim that he could viably state against the

48

Defendants.  Bussey may not use the tools of discovery to hunt for a viable claim in the Defendants' records.  See Dluhos, 162 F.3d at 69 ("[A] motion to amend should be denied if there is an 'apparent or declared reason -- such as undue delay, bad faith or dilatory motive . . ., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment.'" (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  The Court therefore denies Bussey's motion to amend.

### III. ORDER

For the reasons set forth above, it is hereby

**ORDERED** that the September 30, 2005 order (Docket No. 25) is amended to include this Decision and Order; and it is further

**ORDERED** that the portion of the September 30, 2005 order granting Defendants' motion for summary judgment as to Plaintiff's equal protection claim is VACATED; and it is further

**ORDERED** that the motion of defendants William Phillips, Dolores Thornton, David Thacker, and James Temple for summary judgment (Docket Nos. 8 & 19) is GRANTED IN PART and DENIED IN PART; the motion is GRANTED as to defendant David Thacker ("Thacker") in that all claims against Thacker are dismissed; the motion is GRANTED as to all claims except the equal

protection claim and is DENIED without prejudice as to the equal

protection claim with leave to renew after the completion of the discovery ordered by this Court; and it is further

**ORDERED** that plaintiff Kevin Bussey's ("Bussey") motion for discovery and for leave to amend the Complaint is GRANTED IN PART and DENIED IN PART; the motion is DENIED in that Bussey may not amend his complaint and may not have discovery into any claim other than his equal protection claim; the motion is GRANTED in that Bussey may (1) submit interrogatories to Defendants on the circumstances surrounding his removal from the Industry Program and the removal of inmates James Thomas and M. Harold from the Industry Program and their subsequent reinstatement to that assignment, (2) submit affidavits from knowledgeable witnesses to specific instances of unequal treatment relevant to Bussey's equal protection claim, and (3) submit interrogatories to Defendants as to Defendant Delores Thornton's personal involvement in the removal of Bussey from the Industry Program; and it is finally

**ORDERED** that Defendants may submit affidavits or other relevant evidence in response.

**SO ORDERED.**

Dated:   New York, New York
         10 March 2006

Victor Marrero
U.S.D.J.

50